## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ST. ALEXIUS MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 8890 |
| v. | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| ROOFERS' UNIONS WELFARE TRUST | ) | |
| FUND, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

St. Alexius Medical Center ("St. Alexius") brings this action against the Roofers' Unions Welfare Trust Fund ("the Fund") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (R. 21, Am. Compl.) Before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (R. 56, Fund's Mot.; R. 59, St. Alexius's Mot.) For the reasons stated below, judgment is entered in favor of the Fund.

### RELEVANT FACTS

The following facts are undisputed unless otherwise stated. The Fund is an employee welfare benefit plan established under ERISA that provides health and welfare benefits to eligible participants and beneficiaries. (R. 65, St. Alexius's Resp. to Facts ¶ 3.) St. Alexius is an Illinois medical facility that believes it is owed payment from the Fund for medical services provided to one of the Fund's participants. (*Id.* ¶ 4.)

In order to understand the parties' dispute, some background is necessary on the Fund itself. The Fund has been in existence since 1950 and has been providing health and welfare benefits since that date. (*Id.* ¶ 7.) The terms and conditions of the benefits provided by the Fund

were set forth in a plan document adopted in 1996, referred to herein as the "Historical Plan." (*Id.*; R. 57-9, Historical Plan at 1-300.) Effective January 1, 2006, the Fund adopted a Summary Plan Description ("SPD"), a 100-page "booklet" summarizing the provisions contained in the Historical Plan. (R. 65, St. Alexius's Resp. to Facts ¶¶ 8-10; *see also* R. 57-10, SPD at 39.) The SPD provides that "[i]f any discrepancy exists between [the SPD] and the [Historical] Plan, the provisions of the [Historical] Plan will govern." (R. 65, St. Alexius's Resp. to Facts ¶ 9.) At the time of the SPD's adoption, the Fund's board of trustees adopted the following resolution:

> RESOLVED, that the revised Summary Plan Description be and the same is hereby approved as presented, and
>
> FURTHER RESOLVED, that the [Historical Plan] be amended to the extent necessary to make it consistent with the Summary Plan Description.

(R. 57-15, Resolution at 2.) After the SPD took effect, amendments to the plan—called "Summaries of Material Modifications" or "SMMs"—were made directly to the SPD rather than to the Historical Plan. (R. 57-17, Rachal Aff. ¶ 8.)

In September 2011, a U.S. Department of Labor audit of the Fund noted that the SPD, along with various amendments made after the adoption of the SPD, contained the most updated statement of benefits provided by the Fund. (R. 65, St. Alexius's Resp. to Facts ¶ 16.) According to the minutes of a September 22, 2011, board meeting at which this issue was addressed, the Department of Labor sought clarification "that the SPD is the Plan Document and that all participant rights are derived from the SPD and not the [Historical] Plan Document." (R. 57-16, Minutes at 2.) In response, the board issued an "Important Notice to All Plan Participants" stating as follows:

> The Trustees clarify and confirm that the provisions contained in the Welfare Plan's Summary Plan Description (January 1, 2006 Version) and subsequently issued Summaries of Material Modifications ("SPD") serve as the Welfare Plan's Plan document. The Welfare Plan has been administered using the provisions of

the SPD and not the Plan document in existence prior to publication of the SPD. As such, the provisions in the historical Plan document are not operative and have not been utilized to determine any participant's rights and benefits under the Welfare Plan.

(R. 57-13, Notice at 34.) The parties dispute the significance of this notice—specifically, whether it meant that the SPD would serve as the operative ERISA plan from September 2011 forward, or, alternatively, whether it simply clarified that the SPD was already the operative plan document as of that date. (*See* R. 65, St. Alexius's Resp. to Facts ¶¶ 11-18.)

The Historical Plan and the SPD contain many similarities, including providing for payment of covered expenses incurred by participants upon timely receipt of proof of loss. (*Id.* ¶ 19.) Under either plan, proof of loss must be submitted no more than one year after the date the loss occurred. (*Id.* ¶ 20.) A claim for benefits is considered to have been filed on the date it is received at the Fund office even if the claim is incomplete. (*Id.* ¶ 21.) Post-service claims (meaning claims for services that have already been rendered) are usually approved or denied within 30 days of the date they are received. (*Id.* ¶ 22.) If additional time is required, a "Plan extension" can be requested by the Fund. (*Id.*) Such extensions can occur "when there are circumstances beyond the control" of the Fund, but do not include situations where "a claimant has not provided the Plan with all information or documents needed to process the claim." (*Id.* ¶ 23.) Similarly, a request for additional information or materials from a doctor or other medical provider is not considered a "Plan extension." (*Id.*) The time for the Fund to decide a claim starts running when a claim is considered "complete." (*Id.* ¶ 24.)

Both the Historical Plan and the SPD exclude payment for medical treatment for any injury or illness sustained while a participant was performing "any act of employment" or doing anything pertaining to any occupation or employment for remuneration or profit, regardless of whether benefits are payable in whole or in part under a workers' compensation statute or similar

3

law. (*Id.* ¶ 27.) Both plans delegate discretionary authority to the Fund's board of trustees to interpret the terms of the plan and make benefits decisions in accordance with the plan. (*Id.* ¶ 31.) If a claim for benefits has been denied in whole or in part, the claimant may file a notice of appeal within 180 days after receipt of written notice of the denial.[1] (*Id.* ¶ 25.) Appeals are resolved by a formal review committee, and the claimant has the right to present his or her position in writing or to appear in person, either with or without a legal representative. (*Id.* ¶ 26.) Final benefits decisions are "binding on all persons," except to the extent that such decisions are found to be arbitrary or capricious by a court or arbitrator with jurisdiction over the matter. (*Id.* ¶ 31.)

Notwithstanding these similarities, the SPD and the Historical Plan do contain one material difference: The SPD does not contain any limitations period for filing suit to challenge an adverse benefits determination, whereas the Historical Plan contains a two-year limitations period prohibiting the filing of any civil action more than "two years from the expiration of the time within which proof of loss is required to be furnished." (*Id.* ¶ 29; R. 57-9, Historical Plan at 37.)

Between January 2007 and November 2007—after the adoption of the SPD but before the "Important Notice" was issued in response to the Department of Labor audit—St. Alexius provided hospital services to a Fund participant, who is referred to for privacy reasons only as "Patient." (R. 65, St. Alexius's Resp. to Facts ¶ 4.) These services totaled $153,424 and included

---

[1] The Historical Plan contains a 60-day deadline for filing an administrative appeal, whereas the SPD contains a 180-day deadline. (*See* R. 65, St. Alexius's Resp. to Facts ¶ 25 n.2.) The parties agree that the 180-day deadline governs, as this is the minimum period currently required by ERISA. *See* 29 C.F.R. § 2560.503-1(h)(3)(i) (requiring that an ERISA group health plan "[p]rovide claimants at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination"); *see also Schorsch v. Reliance Standard Life Ins. Co.*, 693 F.3d 734, 741 (7th Cir. 2012) (observing that the minimum appeal period was amended in 2002 from 60 days to 180 days).

two surgeries Patient underwent to repair herniated discs and other impairments in his back.[2] (*Id.* ¶¶ 5, 32; *see also* R. 57-5, Medical Records; R. 57-6, Medical Records; R. 57-7, Medical Records.) In the course of obtaining these services, Patient assigned his right to benefits to St. Alexius, so that payment could be made by the Fund directly to St. Alexius. (R. 71, Fund's Resp. to Facts ¶ 9.) On January 29, 2007, and March 1, 2007, Patient notified the Fund office by telephone that he had undergone back surgery at St. Alexius on January 9, 2007; he stated that the surgery was related to a work injury but that his employer had not yet filed a workers' compensation claim with its insurance carrier.[3] (R. 65, St. Alexius's Resp. to Facts ¶ 33.) He further stated that it was disputed whether his injury was covered by workers' compensation insurance and that he had hired a lawyer to represent him in connection with the matter. (*Id.*)

On May 1, 2007, the Fund office received a subpoena from the Illinois Workers' Compensation Industrial Commission ("Industrial Commission") seeking medical records related to Patient's treatment at St. Alexius. (*Id.* ¶ 34.) On April 9, 2008, St. Alexius sent the Fund a copy of a denial from the workers' compensation insurance carrier for Patient's employer finding that his injury was non-compensable. (*Id.* ¶ 35.) The denial was dated June 8, 2007, but was not received by the Fund office until April 2008. (*Id.*)

---

[2] Between January 2007 and March 2008, St. Alexius submitted five separate claims for charges incurred by Patient: $58,785 for services rendered between January 9, 2007, and January 11, 2007; $286 for services rendered on March 6, 2007; $25,904 for services rendered on March 30, 2007, and March 31, 2007; $849 for services rendered on November 2, 2007; and $67,600 for services rendered between November 23, 2007, and November 29, 2007. (R. 71, Fund's Resp. to Facts ¶ 8.)

[3] St. Alexius objects that Patient's statements to the Fund office constitute hearsay, but under Rule 56, materials submitted in support of summary judgment are not objectionable unless they "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Patient's statements would be admissible through his own testimony, and St. Alexius has not offered any evidence to rebut the fact that the statements were made. It is also worth noting that "[a] plan administrator is not a court of law and is not bound by the rules of evidence." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 622 n.4 (7th Cir. 2008). A reviewing court may consider out-of-court statements if the plan administrator "did so in rendering a decision." *Id.* Accordingly, the Court declines to discount this evidence.

On April 10, 2008, the Fund office wrote to Patient requesting copies of the workers' compensation accident report originally filed with his employer, workers' compensation check stubs, and any determination made by the Industrial Commission as to whether his injury was work-related. (*Id.* ¶ 36.) On April 16, 2008, the Fund office wrote to St. Alexius stating that it had received the workers' compensation carrier denial, but that Patient was required to pursue a claim with the Industrial Commission before any consideration of his claim for benefits would be made by the Fund. (*Id.* ¶ 37.) The letter stated that if the Industrial Commission found Patient's injuries non-compensable under the workers' compensation statute, the charges would then be considered by the Fund. (*Id.*)

On August 14, 2008, St. Alexius wrote to the Fund office stating that it was "our understanding" that the Fund "has denied the above claims pending the outcome of [Patient's] workers' compensation cases as [they] relate to the above claims." (*Id.* ¶ 38.) St. Alexius enclosed copies of documents showing that Patient's workers' compensation claims had been settled for a total of $28,365. (*Id.*) Documents included with the letter showed that Patient had filed multiple workers' compensation claims for various impairments, including herniated discs and spinal injuries allegedly caused by "repetitive trauma and heavy lifting." (R. 57-2, Industrial Commission Documents at 29-32.) The letter from St. Alexius stated that no additional workers' compensation payments would be forthcoming, and that, in St. Alexius's view, the Fund "is now the primary payer" of the hospital bills. (*Id.*, Letter of August 14, 2008, at 39.) The letter closed by requesting immediate payment of the charges, and stating that if the Fund "continues to pend or deny the above claims, we request a copy of the actual insurance policy, the group policy or master plan . . . or other document given to [Patient] or others covered by the same policy describing their benefits under the plan." (*Id.*)

On August 21, 2008, the Fund sent St. Alexius a letter acknowledging receipt of its letter and stating that the Fund office had "requested the medical records for the charges in question," which would be "reviewed upon receipt." (*Id.*, Letter of August 21, 2008, at 36.) The letter further stated, "I am enclosing a copy of our Summary Plan Description as you requested." (*Id.*; *see also* R. 65, St. Alexius's Resp. to Facts ¶ 39.) On October 28, 2008, an attorney for St. Alexius wrote to Fund employee Mary Isenhart, stating that "when we last spoke, you advised me" that the Fund "intended to uphold its denial of coverage" even though, in St. Alexius's view, the bills were not related to a work injury. (R. 57-2, Letter of October 28, 2008, at 28.) St. Alexius's attorney reiterated the request for all applicable plan documents, and closed by stating that if the Fund "is still reviewing this matter, please advise me of the status of this review and whether you require any documentation or information to complete the review." (*Id.*; R. 57, Fund's Facts ¶ 40.)[4]

On December 5, 2008, the Fund denied Patient's claim for benefits. (*Id.* ¶ 41.) Separate denials, referred to as "explanation of benefits" forms, were issued for each of the bills submitted by St. Alexius. (R. 57-8, Denial Forms at 67-85.) The basis for the denial was stated as follows: "Charges incurred in connection with injury or illness sustained while the person is performing any act of employment . . . are not covered under the plan, see page 80, number 42 of your Plan booklet." (*Id.* at 68.) The forms further advised, "If you disagree with this determination, please refer to the Plan's Claim Appeal Procedures located on the reverse side of this form." (*Id.*) The reverse side of the forms contained general information about those procedures, including that an

---

[4] For unknown reasons, St. Alexius failed to respond to the Fund's proposed facts contained in Paragraphs 40-49. (*See* R. 65, St. Alexius's Resp. to Facts at 1-2.) Therefore, these facts are deemed admitted. *See* N.D. ILL. L.R. 56.1(b)(3)(B); *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015). The Court notes that St. Alexius's responses also fail to comply with Local Rule 56.1(b)(3)(A), in that each response does not contain a "concise summary of the paragraph to which it is directed." This has created additional work for the Court, but in the interest of justice, the Court has in its discretion opted to overlook this error. The Court trusts that St. Alexius's counsel will comply with Local Rule 56.1 in the future.

appeal had to be filed in writing with the Fund office within 180 days. (*Id.* at 69; *see also* R. 57, Fund's Facts ¶ 42.)

For reasons not revealed in the record, St. Alexius had no further contact with the Fund office until January 2014, when it re-submitted copies of its August 2008 and October 2008 letters. (R. 57, Fund's Facts ¶ 43.) In a brief letter accompanying these documents, St. Alexius stated, "We feel these claims should have been processed and paid by the Fund. Please forward this issue to your legal department for review." (R. 57-2, Letter of January 28, 2014, at 25.) On February 14, 2014, the Fund sent St. Alexius a letter acknowledging receipt of St. Alexius's "request to appeal," but noted that St. Alexius needed to obtain written authorization from Patient to proceed with an appeal in accordance with the SPD. (*Id.*, Letter of February 14, 2014, at 24.) On February 27, 2014, St. Alexius sent the Fund office a signed authorization from Patient and stated, "Please place our appeal before the appeals committee and or Board of Trustees as soon as possible." (*Id.*, Letter of February 27, 2014, at 14.)

On March 14, 2014, St. Alexius requested a copy of all ERISA plan documents relevant to Patient's claim. (R. 57, Fund's Facts ¶ 45.) On April 24, 2014, St. Alexius wrote to the Fund again and submitted documentation in support of its appeal, including medical records. (*Id.* ¶ 46.) On May 24, 2014, the Fund's review committee denied St. Alexius's appeal, determining that the appeal was "untimely because it was filed more than five years after the written notice of claim denials were issued by the Fund Office." (*Id.* ¶ 48.)

## PROCEDURAL HISTORY

In November 2014, St. Alexius filed this lawsuit. (R. 1, Compl.) St. Alexius subsequently filed an amended complaint asserting two claims. (R. 21, Am. Compl.) In Count I, St. Alexius seeks to recover $153,424 for unpaid hospital bills under 29 U.S.C. § 1132(a). (*Id.* ¶¶ 1-21.) In

Count II, St. Alexius seeks to recover $228,000 in statutory penalties pursuant to 29 U.S.C. § 1132(c)(1)(B), based on the Fund's failure to provide St. Alexius with relevant plan documents in response to separate requests it made in August 2008, January 2014, and March 2014. (*Id.* ¶¶ 22-26.) The Fund moved to dismiss, and the Court dismissed Count II as it pertained to St. Alexius's August 2008 request for the plan documents, finding that this claim was untimely.[5] (R. 35, Mem. Op. & Order at 15.) The motion was denied in all other respects. (*Id.*) Thereafter, the Fund answered the complaint and the case proceeded to discovery. (*See* R. 45, Ans.; R. 46, Min. Entry.) The parties now each move for summary judgment in their favor. (R. 56, Fund's Mot.; R. 59, St. Alexius's Mot.)

In support of its motion, the Fund argues that St. Alexius is not entitled to payment of the hospital bills for several reasons. (R. 58, Fund's Mem. at 2-12.) The Fund believes that St. Alexius's claim is time-barred by the two-year limitations period contained in the Historical Plan, which in the Fund's view is the applicable ERISA plan document. (*Id.* at 7-12.) The Fund further argues that St. Alexius failed to timely exhaust its administrative remedies as required by ERISA. (*Id.* at 2-7.) As to the merits, the Fund argues that the review committee's decision to deny St. Alexius's appeal was neither arbitrary nor capricious, because the appeal was filed long after the 180-day deadline expired. (*Id.* at 12-16.) Finally, the Fund argues that statutory penalties are not warranted under 29 U.S.C. § 1132(c) because St. Alexius received a copy of the SPD in August 2008, and any delay in its receipt of the Historical Plan was not based on bad faith, nor did it result in any prejudice to St. Alexius. (*Id.* at 14-16.)

For its part, St. Alexius believes that it is entitled to payment of the hospital bills incurred by Patient. (R. 60, St. Alexius's Mem. at 2, 6.) St. Alexius argues that its claim is not time-barred

---

[5] The Court also dismissed Count I as untimely, but upon reconsideration this claim was reinstated. (*See* R. 44, Order.)

because the SPD is the governing ERISA plan document, and the SPD does not contain a statute of limitations. (*Id.* at 3-4.) St. Alexius further argues that it exhausted its administrative remedies within the 180-day deadline because its August 2008 letter to the Fund office constituted an administrative appeal. (*Id.* at 2, 6.) On the merits, St. Alexius argues that the Fund's decision to deny its appeal was arbitrary and capricious because the charges at issue were not related to a work injury. (*Id.* at 10.) St. Alexius also argues that it is entitled to statutory penalties under 29 U.S.C. § 1132(c) because the Fund did not produce a copy of the Historical Plan until after this lawsuit was filed. (*Id.* at 14-15.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted). When considering cross-motions for summary judgment, the Court must "construe all facts and inferences in favor of the

party against whom the motion under consideration is made." *Orr v. Assurant Emp. Benefits*, 786 F.3d 596, 600 (7th Cir. 2015).

The movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Nor can "speculation and conjecture" defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013).

The Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

# ANALYSIS

ERISA is a comprehensive statute designed to protect the interests of participants and their beneficiaries in employee benefit plans.[6] *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361-62 (1980). ERISA provides a civil cause of action by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting 29 U.S.C. § 1132(a)(1)(B)). Resolution of an ERISA claim is "governed by a federal common law of contract keyed to the policies codified in ERISA." *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 911 (7th Cir. 2013).

Benefits determinations are reviewed by the Court *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Edwards*, 639 F.3d at 360 (citation omitted). In such cases, the benefits determination is reviewed under the "arbitrary and capricious" standard. *Id.* Under this deferential standard, the Court must decide only whether the plan administrator's decision "has rational support in the record." *Id.* (citation omitted). In plain terms, "an administrator's decision will not be overturned unless it is downright unreasonable." *Id.* (citation and internal quotation marks omitted).

## I.      Statute of Limitations

The parties first dispute whether this action was timely filed. (R. 58, Fund's Mem. at 7-12; R. 60, St. Alexius's Mem. at 6-7.) ERISA does not contain a specific statute of limitations, so

---

[6] St. Alexius qualifies as a "beneficiary" for purposes of ERISA. *See Penn. Chiropractic Ass'n v. Indep. Hosp. Indem. Plan, Inc.*, 802 F.3d 926, 928 (7th Cir. 2015) ("[W]hen a 'participant' assigns to a medical provider the right to receive the participant's entitlement under the plan, this makes the provider a 'beneficiary' under § 1002(8).").

courts must borrow the most analogous statute of limitations from state law. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 815 (7th Cir. 2010). The U.S. Court of Appeals for the Seventh Circuit has long held that the ten-year limitations period applicable to breach of contract claims under Illinois law applies to claims seeking benefits under ERISA. *See Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 465 (7th Cir. 1991); *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan*, 713 F.2d 247, 252-54 (7th Cir. 1983). Nevertheless, because an ERISA plan is in essence a contract, the parties are free to agree to a shorter limitations period, and this shorter period will be fully enforceable as long as it is not unreasonable. *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 612 (2013). Untimeliness is an affirmative defense on which the defendant bears the burden of proof. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014).

To resolve the parties' dispute over the timeliness of the complaint, the Court must determine whether the Historical Plan or the SPD governs the resolution of St. Alexius's claim.[7] If the Historical Plan governs, a two-year limitations period applies, and this action—filed in 2014 and challenging a 2008 benefits denial—would be untimely. If the SPD governs, then the general ten-year statute of limitations applies and this action would be timely.

After careful review of the record, the Court agrees with St. Alexius that the SPD is the governing plan document. The relevant plan for purposes of ERISA is the one in effect at the time benefits were denied. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315

---

[7] At the pleading stage, the Court made a preliminary determination that the Historical Plan was the governing document. (*See* R. 35, Mem. Op. & Order at 5.) Since that time the record has been fully developed, and the Court is not bound by that earlier determination. *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 739 (7th Cir. 2010) (observing that "[d]octrines such as 'law of the case' do not prohibit the trial judge from revisiting an earlier ruling" prior to the entry of final judgment); *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) (holding that a district court is "free to take a new look" at a legal issue decided at an earlier stage of the litigation based on intervening events).

F.3d 771, 774 (7th Cir. 2003). In this case, that occurred in December 2008, when the formal denial of benefits was issued by the Fund. (R. 57, Fund's Facts ¶ 41.) The record reflects that the SPD took effect in January 2006. (R. 65. St. Alexius's Resp. to Facts ¶¶ 8-10.) At the time of the SPD's adoption, the Board resolved that if there were any inconsistencies between the two documents, the Historical Plan was amended to conform with the SPD. (R. 57-15, Resolution at 2.) Thereafter, all amendments to the plan were made directly to the SPD rather than to the Historical Plan. (R. 57-17, Rachal Aff. ¶ 8.) Then in September 2011, in response to the Department of Labor audit, the Board issued a notice clarifying that the SPD and modifications thereto "*serve* as the Welfare Plan's plan document." (R. 57-13, Notice at 34 (emphasis added).) The notice further clarified that the Fund "*has been* administered using the provisions of the SPD and not the [Historical] Plan document in existence prior to the publication of the SPD. As such, the provisions in the [H]istorical Plan document *are not operative and have not been utilized* to determine any participant's rights and benefits . . . ." (*Id.* (emphasis added).)

The Fund argues that these documents show that "the SPD was not the controlling ERISA plan document until September 2011," (R. 58, Fund's Mem. at 11), but the Court disagrees. The verb tenses used in the notice make clear that the SPD was *already* the operative plan document as of September 2011.[8] Indeed, the Fund concedes in its response brief that the

---

[8] The Court is cognizant of the U.S. Supreme Court's opinion in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), cited by the Fund, which held that an SPD does not automatically become the governing ERISA plan every time one is drafted. *Id.* at 1877 ("[W]e cannot agree that the terms of statutorily required plan summaries . . . necessarily may be enforced (under [§ 1132(a)(1)(B)]) as the terms of the plan itself."). The Court does not read *CIGNA* to hold that a document that begins as an SPD can *never* constitute the applicable plan document. Here the Fund's Board of Trustees expressly stated that the provisions of the Historical Plan were "not operative" and had "not been utilized" to make benefits determinations since the adoption of the SPD. (R. 57-13, Notice at 34.) It is also notable that when St. Alexius requested all relevant plan documents back in August 2008, the Fund office sent only the SPD, suggesting that the Fund itself viewed the SPD as the operative plan at that time. (R. 57-2, Letter of August 21, 2008, at 36; R. 65, St. Alexius's Resp. to Facts ¶ 39.)

SPD "evolved to be the more relevant document because it contained all the amendments from 2006 onward." (R. 62, Fund's Resp. at 10.)

The Court has duly considered the affidavit of Julie Rachal, the Fund's administrator, attesting that even after adoption of the SPD, the Fund office "continued to reference the [Historical] Plan if there was a question about interpreting a provision of the SPD or if the [Historical] Plan contained terms and conditions that were not included in the SPD." (R. 57-17, Rachal Aff. ¶ 10.) The Court accepts that the Fund office still referred to the Historical Plan on occasion even after adoption of the SPD, and that the SPD itself refers back to the Historical Plan where any discrepancies exist. (*See id.* ¶ 7.) But "plan" is a term of art under ERISA, and what constitutes the operative plan in this case is a legal determination to be made by the Court. *See, e.g.*, *Pegram v. Herdich*, 530 U.S. 211, 222-23 (2000) ("ERISA's definition of an employee welfare benefit plan is ultimately circular . . . . One is thus left to the common understanding of the word 'plan' as referring to a scheme decided upon in advance[.]"); *Larson*, 723 F.3d at 912 ("[C]onfusion is all too common in ERISA land; often the terms of an ERISA plan must be inferred from a series of documents[,] none clearly labeled as 'the plan.'" (citation omitted)); *Mers v. Marriott Int'l Grp. Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1024 (7th Cir. 1998) (resolving parties' dispute over what document constituted the operative "plan" for purposes of ERISA).

Based on the formal actions of the board, the Court concludes that the SPD was the operative plan at the time benefits were denied by the Fund in 2008. Because the SPD does not contain a specific statute of limitations, the ten-year limitations period borrowed from state law applies, making this action filed in 2014 timely. *See Lumpkin*, 933 F.2d at 465; *Jenkins*, 713 F.2d at 252-53.

But even if the Court were to agree with the Fund that the Historical Plan governs, the Court would still find this action timely. Notwithstanding the two-year limitations period contained in the Historical Plan, that document also provides as follows:

> If any time limitations of the PLAN, with respect to giving notice of claims or furnishing proof of loss or the bringing of an action at law or in equity, is less than that permitted by the law or by the State of Illinois, such limitation is hereby extended to agree with the minimum period permitted by such law.

(R. 57-9, Historical Plan at 37.) The Fund reads this language to mean that the "limitations period would be extended only if there was a state law *directly conflicting* with the Plan's provision." (R. 62, Fund's Resp. at 12 (emphasis added).) This is plainly not what the provision says. The provision makes no mention of a "direct conflict" with the law, nor does it limit itself solely to Illinois law. It is far more generous, extending the limitations period whenever a longer period is "*permitted* by the law *or* by the State of Illinois." (R. 57-9, Historical Plan at 37 (emphasis added).) A separate provision of the Historical Plan, entitled, "Governing Law," supports a conclusion that the plan intended to incorporate federal law where applicable. That section provides:

> All questions pertaining to the validity, construction, or interpretation of the Trust Agreement, the PLAN, and the acts and transactions of the Trustees or of any matter affecting the PLAN or Fund will be determined *under Federal Law where applicable Federal Law exists*; where no applicable Federal law exists, the laws of the State of Illinois will apply.

(*Id.* at 38 (emphasis added).) As explained above, there is applicable federal law holding that a ten-year limitations period applies to claims like the one raised by St. Alexius. *See Lumpkin*, 933 F.2d at 465; *Jenkins*, 713 F.2d at 252-53. Thus, even if the Historical Plan were deemed the governing plan document, the Court would find St. Alexius's claim timely. The Court therefore declines to grant summary judgment to the Fund on grounds of untimeliness.

## II. Exhaustion

The parties next dispute whether St. Alexius properly exhausted its administrative remedies before bringing this action. (*See* R. 58, Fund's Mem. at 2-7; R. 64, St. Alexius's Resp. at 4-8.) ERISA does not expressly address whether exhaustion of administrative remedies is a precondition to filing suit. *Edwards*, 639 F.3d at 360. However, "because ERISA directs employee benefit plans to provide adequate written notice of the reasons for denials of claims by plan participants and to create procedures for the review of such denials of claims," the Seventh Circuit has long "interpreted ERISA as requiring exhaustion of administrative remedies as a prerequisite to bringing suit under the statute." *Id.* The exhaustion requirement was "not intended to place a meaningless procedural hurdle in front of plaintiffs who desire to bring claims for violations of their rights under ERISA in federal court." *Gallegos v. Mount Sinai Med. Ctr.*, 210 F.3d 803, 809 (7th Cir. 2000). Rather, it serves several importation functions:

> Exhaustion encourages informal, non-judicial resolution of disputes about employee benefits. . . . [T]he trustees of covered benefit plans are granted broad fiduciary rights and responsibilities under ERISA and implementation of the exhaustion requirement enhances their ability to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes. Additionally, the requirement of exhaustion of administrative remedies helps to prepare the ground for litigation in case administrative dispute resolution proves unavailing. Compelling parties to exhaust administrative remedies can help a court by requiring parties, in advance of bringing suit, to develop a full factual record and by enabling the court to take advantage of agency expertise.

*Edwards*, 639 F.3d at 360-61 (citations, internal quotation marks, and alterations omitted). The failure to pursue a timely administrative appeal from a denial of benefits "is one means by which a claimant may fail to exhaust her administrative remedies." *Id.* at 362 (citation omitted). Failure to exhaust is an affirmative defense on which the defendant bears the burden of proof. *See Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 729-30 (7th Cir.

2007); *Lange v. Univ. of Chicago*, No. 15 C 7303, 2015 WL 7293588, at *2 (N.D. Ill. Nov. 19, 2015).

The Court can excuse lack of compliance with the exhaustion requirement in certain limited circumstances. *Edwards*, 639 F.3d at 361. Specifically, "[a]n ERISA plaintiff's failure to exhaust administrative remedies may be excused where there is a lack of meaningful access to review procedures, or where pursuing internal plan remedies would be futile." *Id.* Futility can only be demonstrated if it is "certain" that the plaintiff's claim would have been denied had the plaintiff pursued his administrative remedies. *Ruttenberg v. U.S. Life Ins. Co. in City of N.Y.*, 413 F.3d 652, 662 (7th Cir. 2005). Whether to excuse the plaintiff's failure to exhaust is a decision firmly committed to the Court's discretion. *Orr*, 786 F.3d at 601-02.

The record here shows that St. Alexius did not timely exhaust its administrative remedies. The parties agree that St. Alexius was subject to a 180-day deadline for filing an administrative appeal challenging the denial of benefits. *See* 29 C.F.R. § 2560.503-1(h)(3)(i).The Fund issued a formal benefits determination on December 5, 2008, and that decision was subject to administrative review within 180 days.[9] (R. 57-8, Denial Forms at 67-85.) St. Alexius did not file an administrative appeal by that deadline, and instead waited five years—until January 2014—to pursue a formal appeal. This is far beyond the 180-day deadline.

---

[9] St. Alexius makes a cursory argument that proper notice of the benefits determination was not given back in 2008. (R. 64, St. Alexius's Resp. at 6.) The Court finds this argument unavailing. Documentation submitted by the Fund shows that the claims were denied in electronic submissions to the Fund's claims manager, Blue Cross and Blue Shield of Illinois, which in turn notified the provider. (R. 57-2, Letter of April 28, 2014, at 16.) Explanation of benefits forms reflecting the denials were also mailed directly to Patient. (*Id.*) As of December 2008, St. Alexius had not provided the Fund with written authorization from Patient permitting it to act as his formal representative as required by the plan. (*See id.*) In fact, the record shows that St. Alexius did not provide this authorization until February 2014. (R. 57-2, Letter of February 21, 2014, at 14-15.) St. Alexius has offered nothing to rebut the Fund's evidence regarding notice, and summary judgment cannot be defeated with mere "speculation and conjecture." *Cooney*, 735 F.3d at 519; *see also Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal.").

Nowhere in its filings does St. Alexius offer any explanation for this lengthy delay. Instead, St. Alexius argues that its August 2008 letter to the Fund office should be construed as an appeal. (R. 60, St. Alexius's Mem. at 6.) In certain instances, a letter may be deemed an administrative appeal that satisfies ERISA's exhaustion requirement. *See Edwards*, 639 F.3d at 363 ("[I]n some instances, a plan participant's letter to a plan may be construed as an appeal."). But this is not one of those cases. Notably, at the time St. Alexius sent its August 2008 letter, the Fund had not yet issued a denial of benefits. Indeed, a request for administrative review "presupposes an underlying decision to review," and no such decision had been made by the Fund as of August 2008. *Orr*, 786 F.3d at 601 (ERISA plaintiff's letter to plan office did not constitute an administrative appeal where it was filed two months before the adverse benefits determination was made).

St. Alexius argues that the Fund had already denied its claim at the time of the August 2008 letter, (R. 60, St. Alexius's Mem. at 6-7), but the correspondence between the parties does not bear this out. Instead, the letters between the parties show that the Fund's position was that it would not consider the claims at all until after the Industrial Commission proceedings had concluded. (*See* R. 57-2, Letter of April 16, 2008, at 51 ("[I]f the Industrial Commission finds his claim to be not compensable, the charges will be considered by the Fund."). St. Alexius was clearly unhappy with that position, but the correspondence does not show that either party understood the claim to have been conclusively denied on the merits as of August 2008. Indeed, after St. Alexius notified the Fund in August 2008 that the Industrial Commission proceedings had concluded and that Patient had received a $28,000 settlement, the Fund sent St. Alexius a letter stating that it was now reviewing the claims. (*Id.*, Letter of August 21, 2008, at 36.) Thereafter, in December 2008, the Fund issued a formal denial of benefits. (R. 57-8, Denial

Forms at 67-85.) In light of these documents, the Court finds no basis to conclude that St. Alexius's claim had already been "denied" as of the date of St. Alexius's August 2008 letter.

In addition to the timing issue, the wording of St. Alexius's August 2008 letter does not support an argument that the document was intended as a request for administrative review. The letter did not use the word "review" or "appeal," and instead merely informed the Fund that the workers' compensation proceedings had concluded and stated that the hospital bills were now due and payable. (R. 57-2, Letter of August 14, 2008, at 38-39.) The letter ended with a request for remittance of payment. (*Id.* at 39.) Even reading this letter generously, it cannot be construed as a request for administrative review. *See Edwards*, 639 F.3d at 363-64 (holding that letters from plan participant could not be construed as a request for administrative review where it merely expressed an intention to appeal based on further action by the plan); *Swanson v. Hearst Corp. Long Term Disability Plan*, 586 F.3d 1016, 1018-19 (5th Cir. 2009) (holding that beneficiary's letters to plan administrator sent within 180 days of benefits determination could not be construed as an appeal, where the letters expressed disagreement with the benefits determination and the materials actually supporting an appeal were not sent until "more than three years later"); *Kieszkowski v. PersonalCare Ins. of Ill., Inc.*, No. 09 C 1936, 2011 WL 3584324, at *6-7 (N.D. Ill. Aug. 12, 2011) (concluding that "looking at [plaintiff's] October 13 letter, as well as all of the other correspondence between [the parties], it is evident that [plaintiff] never formally participated in the appeal process.").

It is worth contrasting the language of the August 2008 letter to the language St. Alexius used in its January 2014 correspondence with the Fund office, where it clearly and succinctly expressed disagreement with the adverse benefits determination and requested formal review by the Fund's legal department. (R. 57-2, Letter of January 28, 2014, at 25.) Indeed, if St. Alexius

believed its August 2008 letter constituted an administrative appeal, it is unclear why it would

have seen the need to pursue another formal appeal in January 2014 before bringing this lawsuit.

St. Alexius suggests that the Fund's failure to adjudicate its claim in accordance with the

timelines and other procedures contained in the SPD means that the claim should be considered

to have been denied as of the date of the August 2008 letter. (R. 64, St. Alexius's Resp. at 5-6.)

Presumably St. Alexius is invoking 29 C.F.R. § 2560.503-1(l),[10] which applies when "the plan

has failed to provide a reasonable claims procedure that would yield a decision on the merits of

the claim." *Schorsch*, 693 F.3d at 742. This provision "assumes claimants attempted to exhaust

their administrative remedies but the lack of a reasonable claims procedure blocked a decision on

the merits of the claim." *Id.* (citation and internal quotation marks omitted). It does not apply to

claimants who never attempted to exercise their rights, *id.*, or to those, like St. Alexius, who

actually obtained a decision on the merits, *Lundsten v. Creative Cmty. Living Servs., Inc. Long

Term Disability Plan*, No. 13-C-108, 2014 WL 2440716, at *5 (E.D. Wis. May 30, 2014).

Although the benefits determination came later than what St. Alexius felt was appropriate, the

record clearly shows that a formal benefits determination was made in this case.

But even if the Court accepted St. Alexius's argument, it is clear that St. Alexius had

additional appeal rights after the formal benefits determination was made in December 2008. The

explanation of benefits forms specifically stated that the benefits determination could be

---

[10] Although unclear, St. Alexius may be referring to an older version of the regulations, which provided that a plan administrator's failure to issue a timely claims decision meant that the claim was "deemed denied"; however, that regulation is no longer in effect and was replaced with Section 2560.503-1(1) in 2000. *See Lundsten v. Creative Cmty. Living Servs., Inc. Long Term Disability Plan*, No. 13-C-108, 2014 WL 2440716, at *4 (E.D. Wis. May 30, 2014). To the extent St. Alexius is relying on the language of the SPD, which also refers to a claim being "deemed denied" if it is not decided in accordance with the timelines specified in the plan, that is also of little help to St. Alexius. The SPD clearly states: "No claim shall be considered to have been denied, and a claimant may not file suit against the Plan, until the claimant has exhausted all of the procedures described in these Claim and Appeal Procedures." (R. 57-11, SPD at 90.)

appealed to the Fund office within 180 days. (R. 57-8, Denial Forms at 67-85.) The appeals

procedure, including the 180-day deadline for filing an appeal, was also set forth in the SPD that

was given to St. Alexius in August 2008. (R. 57-11, SPD at 88-89; R. 65, St. Alexius's Resp. to

Facts ¶ 39.) St. Alexius chose not to avail itself of this remedy, and its failure to do so means that

it did not satisfy the exhaustion requirement. *See Orr*, 786 F.3d at 602 (affirming judgment for

plan administrator based on lack of exhaustion where the plaintiff completed the first level of

administrative review but failed to complete the second level of review). For these reasons, the

Court concludes that St. Alexius did not timely exhaust its administrative remedies before filing

suit.

St. Alexius alternatively argues that its failure to exhaust should be excused on grounds

of futility, citing to the Seventh Circuit's opinion in *Ruttenberg*.[11] (R. 60, St. Alexius's Mem. at

13; R. 64, St. Alexius's Resp. at 7.) But there the Seventh Circuit decided only that the district

court had acted within its discretion in finding that exhaustion would have been futile based on a

very unique set of facts. As was summarized by the Seventh Circuit:

> Mr. Ruttenberg filed suit prematurely; U.S. Life had not officially granted or
> denied his claim when he brought suit. He agreed to stay the proceedings to
> conclude the administrative process, but, once U.S. Life denied his claim, he
> undoubtedly failed to file an administrative appeal within the allowable 180-day
> time period. Despite these failures, there certainly is nothing in the record
> indicating that, had Mr. Ruttenberg complied with the administrative appeals
> requirement, U.S. Life would have altered its decision to deny benefits. Indeed,
> the record indicates that U.S. Life has opposed Mr. Ruttenberg's claim at every
> step. U.S. Life spent more than eighteen months adjudicating Mr. Ruttenberg's
> claim. In the course of this process, it contested every medical opinion favorable
> to Mr. Ruttenberg, including that of its own expert Dr. Diamond. After Mr.
> Ruttenberg agreed to a stay in the proceedings, U.S. Life spent over a year
> reviewing his submission before it denied the claim, knowing that he would
> resume the suit in the event of an unfavorable result.

---

[11] St. Alexius also makes a passing reference to the U.S. Court of Appeals for the Third Circuit's opinion
in *Mirza v. Insurance Administrator of America, Inc.*, 800 F.3d 129 (3d Cir. 2015), (*see* R. 64, St.
Alexius's Resp. at 6), but that case dealt with timeliness of a complaint rather than administrative
exhaustion. As explained above, St. Alexius's complaint has been deemed timely filed.

*Ruttenberg*, 413 F.3d at 662-63.

That is a far cry from the present case. At most St. Alexius has shown that there was an initial delay by the Fund in reviewing the claim pending a determination by the Industrial Commission. St. Alexius made repeated requests for payment during this period, but the Fund did not address these requests on the merits: Instead, it made its position clear that it was going to await conclusion of the workers' compensation proceedings before considering the claim at all. (R. 57-2, Letter of April 16, 2008, at 46.) Once the Fund was notified that the Industrial Commission proceedings had concluded, it reviewed the claim on the merits and ultimately issued a formal denial. (*Id.*, August 21, 2008, Letter at 36; R. 57-8, Denial Forms at 67-85.) There is nothing before the Court to suggest that it was "certain" the Fund would have hewed to its initial decision to deny the claim had St. Alexius pursued a timely appeal.[12] *Ruttenberg*, 413 F.3d at 662. St. Alexius "cannot circumvent ERISA's administrative remedies by simply pointing to errors in [the Fund's] claims . . . process." *Schorsch*, 693 F.3d at 739.

For these reasons, the Court concludes that St. Alexius did not exhaust its administrative remedies before filing suit. The Court finds no basis on this record to excuse St. Alexius's failure to exhaust. Therefore, summary judgment for the Fund is warranted. *See Orr*, 786 F.3d at 602 (affirming summary judgment for ERISA plan administrator where plaintiffs failed to fully exhaust their administrative remedies); *Edwards*, 639 F.3d at 362-63 (affirming summary judgment for ERISA plan administrator where plaintiff submitted an untimely appeal); *Schorsch*,

---

[12] Indeed, an independent medical reviewer opined in 2014 that Patient's back problems were not related to a work injury and were due instead to a degenerative condition. (R. 57-3, Medical Reviewer Report at 9-13.) Had this information been presented to the Fund in a timely fashion, it may have resulted in a decision by the Fund to cover Patient's hospital bills.

693 F.3d at 740-41 (affirming summary judgment for ERISA plan administrator where plaintiff never submitted an administrative appeal).

## III. Merits

### A. Count I: Unpaid Medical Bills

If the Court were to reach the merits of Count I, the Court could consider only whether the Fund's decision was arbitrary and capricious, as the SPD delegates discretionary authority to the Fund's board of trustees to interpret and make benefits decisions under the plan. *See* 29 U.S.C. § 1132(a)(1)(B); *Edwards*, 639 F.3d at 360-61. Under the arbitrary and capricious standard, the Fund's decision must be upheld unless it was "downright unreasonable." *Edwards*, 639 F.3d at 360. St. Alexius has not met this standard.

The record shows that the Fund's decision is based on a straightforward application of the SPD's 180-day deadline for filing an administrative appeal. St. Alexius filed its appeal years after that deadline and has never offered any explanation for this lengthy delay. ERISA plan administrators have "an interest in finality of decisions regarding claims for benefits that militates against reopening a plan's administrative claim process willy-nilly." *Edwards*, 639 F.3d at 362 (citation and internal quotation marks omitted). While it may seem harsh, the Court cannot conclude that the Fund's decision to enforce the deadline was "downright unreasonable." *See Edwards*, 639 F.3d at 362 ("[T]he Plan has fixed a clear deadline of 180 days for filing administrative appeals from denials of benefits, and the Plan has the right to enforce that deadline. . . . [T]he Plan's refusal to entertain [plaintiff's] untimely administrative appeal was not arbitrary and capricious[.]"); *Wagner v. Allied Pilots Ass'n Disability Income Plan*, 383 F. App'x 565, 569 (7th Cir. 2010) ("The administrator must implement and follow the plain language of the plan, in so much as they are consistent with the statute. This includes a deadline that is

consistent with the regulations governing ERISA claims."). For these reasons, even if the Court were to reach the merits, the Fund would be entitled to summary judgment on Count I.

### B.    Count II: Penalties for Non-Disclosure

With respect to Count II, St. Alexius argues that it is entitled to statutory penalties in excess of $200,000 due to the Fund's failure to produce the Historical Plan in response to the requests it made for the applicable plan documents in 2008 and 2014. (R. 60, St. Alexius's Mem. at 14-15.) The Fund argues that St. Alexius is not entitled to any penalties under the facts of this case. (R. 58, Fund's Mem. at 15-16.)

Upon written request by a participant or beneficiary, the plan administrator has an obligation to produce to a plan participant "with the latest updated summary plan description, [ ] the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). The purpose of this provision is to "ensure[ ] that the individual participant knows exactly where he stands with respect to the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 118 (1989) (citation and internal quotation marks omitted). "Knowing where one stands with respect to a plan includes having the information necessary to determine one's eligibility for benefits under the plan" and to "ascertain the procedures one must follow in order to obtain benefits." *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 793 (7th Cir. 2009).

When a plan administrator fails to comply with this provision, he or she is subject to a fine of up to $110 per day. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-3. Each failure to produce the requisite documents constitutes a separate violation. 29 U.S.C. § 1132(c)(1). In deciding whether to impose sanctions, the Court can consider such factors as the length of the delay; the number of requests made and the nature of the documents withheld; whether there is

evidence of bad faith by the administrator; and whether the failure to provide the documents prejudiced the beneficiary. *Jacobs v. Xerox Corp. Long Term Disability Income Plan*, 520 F. Supp. 2d 1022, 1030 (N.D. Ill. 2007).

Based on the record, the Court finds penalties unwarranted in this case. It is undisputed that the Fund produced the SPD to St. Alexius in August 2008 in response to St. Alexius's first request, and again in March 2014 shortly before this lawsuit was filed. (R. 57-2, Letter of August 21, 2008, at 36; R. 57-8, Letter of March 27, 2014, at 86.) Thus, St. Alexius had possession of the relevant ERISA plan document since the inception of the parties' dispute. St. Alexius argues that the Fund should have also provided it with a copy of the Historical Plan (R. 60, St. Alexius's Mem. at 14-15), but as outlined above, the Court has concluded that the SPD was the relevant plan document throughout the relevant period. Everything necessary to "determine [St. Alexius's] eligibility for benefits" and "ascertain the procedures [St. Alexius] must follow in order to obtain benefits" can be discerned from this document. *Mondry*, 557 F.3d at 792-93. The only relevant difference between the SPD and the Historical Plan is the statute of limitations, and as explained above, the shorter limitations period contained in the Historical Plan has not been used to bar St. Alexius's claim.[13] Other than the limitations period, St. Alexius has not identified any manner in which it was prejudiced by not having access to the Historical Plan. (*See* R. 64, St. Alexius's Resp. at 12; R. 70, St. Alexius's Reply at 5-6.)

In summary, the Court does not find bad faith on the part of the Fund's administrator or prejudice to St. Alexius based on the fact that St. Alexius did not receive a copy of the Historical Plan until after this lawsuit was filed. Accordingly, the Court declines to award sanctions in this case. *See Hakim v. Accenture U.S. Pension Plan*, 735 F. Supp. 2d 939, 955-56 (N.D. Ill. 2010)

---

[13] As previously stated, the two plans also contain different deadlines for filing an administrative appeal, but St. Alexius has been given the benefit of the longer deadline here.

(declining to impose sanctions where the defendant's delay in producing plan documents was not the result of bad faith and there was no evidence of prejudice to the plaintiff); *Jacobs*, 520 F. Supp. 2d at 1045 (declining to impose sanctions under Section 1132(c)(1) "where Plaintiff has suffered no substantial prejudice and no evidence of fraud or malice exists").

## CONCLUSION

For these reasons, the motion of Roofers' Unions Welfare Trust Fund (R. 56) is granted. The motion of St. Alexius Medical Center (R. 59) is denied. The clerk is directed to enter judgment in favor of Roofers' Unions Welfare Trust Fund.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: January 31, 2017**